T.C. Memo. 2009-22

UNITED STATES TAX COURT

JOHN M. RODRIGUEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16342-04.                    Filed January 29, 2009.

<u>Jerry B. Register</u>, for petitioner.

<u>Randall Durfee</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  John Rodriguez is a real-estate sales manager who also had personal real-estate investments.  He did not file income tax returns from 1998 through 2001.  The IRS noticed, and created "substitutes for returns" (SFRs) for him, calculating his tax liability and penalties.  The Commissioner then issued him a notice of deficiency for each year.  Rodriguez

filed a petition challenging the deficiencies, and then submitted his own Forms 1040 for the missing years. Rodriguez claims that his returns should take precedence over the SFRs and that the Commissioner has the burden of proving the deductions which he claimed on them are not allowable. The parties also argue about many of those deductions, as well as about the penalties and additions to tax that the Commissioner has determined.

## Background

Rodriguez's entrepreneurial talents showed up early. While still in college, he began a landscaping and irrigation business under the name of Waterfowl. In 1998, he became an independent contractor selling and managing parcels of land for SunTex-Fuller Corporation in a new development called Montgomery Trace, near Conroe, Texas. That prompted him to shift Waterfowl's focus away from irrigation and into real-estate development.

During all the years in question, Rodriguez had a bank account under the name Waterfowl with the First Bank of Conroe. He often used this account, though it was in his business's name, to pay his personal expenses. He also mixed business and personal expenses on his credit card.

The parties agree that in 1998, 1999, 2000, and 2001, Rodriguez earned income from his sales manager job; and in 1998, he also made money selling real estate:

| Tax Year | Sales Manager Job | Sale of Real Estate |
|----------|-------------------|---------------------|
| 1998 | $14,138 | $137,900 |
| 1999 | 139,324 | -0- |
| 2000 | 93,653 | -0- |
| 2001 | 125,825 | -0- |

Because Rodriguez didn't file returns for these years, the Commissioner prepared SFRs in April 2004 and issued notices of deficiency in June 2004.  The notices of deficiency determined that he owed more than $150,000 on this income, plus additions for failure to timely file his returns and timely pay the tax owed, and penalties for underwithholding.

Rodriguez was a resident of Texas when he filed his petition, and we tried his case in Houston.

## Discussion

### I.  Preliminaries

Though Rodriguez is represented by counsel, the parties were able to settle very few issues, so we begin by reviewing some of the basics of substantiation.  The most important is that taxpayers have to keep records.  Section 6001[1] and its accompanying regulations tell taxpayers to keep records that would enable the IRS to verify their income and expenses.  See sec. 1.6001-1(a), Income Tax Regs.

---

[1]  Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

As a general rule, we presume the Commissioner's determination in the notice of deficiency is correct. Because the taxpayer is usually in a better position to show what he earned and what he spent, it is he who generally has the burden of proof. At least for tax years after 1998, that burden can shift to the Commissioner, but only if a taxpayer produces credible evidence meeting the requirements of section 7491(a). See also Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). But with few exceptions, it does him no good to argue that the Commissioner wasn't working with good information--the notice of deficiency puts issues in play for trial; it is not itself the focus of litigation. Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984).

Rodriguez objects to the Commissioner's decision to prepare SFRs for his missing returns. But section 6020(b)(1) states that "If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefor * * * the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise."[2] We've held that this means that the IRS has full authority to prepare an SFR for anyone who fails to

---

[2] Rodriguez mischaracterizes Spurlock v. Commissioner, 118 T.C. 155 (2002), as holding that the Commissioner has no authority to file SFRs. Spurlock actually held only that SFRs were not returns under section 6211(a). Id. at 161.

file his own return.  Millsap v. Commissioner, 91 T.C. 926, 931 (1988).  And section 6020(b)(2) provides that an SFR, once filed, is "prima facie good and sufficient for all legal purposes."  In this case, the good and sufficient SFRs were used by the Commissioner to calculate Rodriguez's tax liability in the notices of deficiency.  Rodriguez's late-filed 1040s simply do not take precedence over the SFRs.

Rodriguez next argues that the best evidence rule somehow lets his 1040s trump the SFRs.  He argues that when both parties produce evidence to support their claims, the best evidence rule determines whose evidence should prevail.

But that's not what it means.  Rule 1004 of the Federal Rules of Evidence--the version of the best evidence rule that federal courts use--provides that where an original writing is lost or destroyed, secondary evidence of the contents of the writing is admissible unless the proponent lost or destroyed the writings in bad faith.  McMahon v. Commissioner, T.C. Memo. 1991-355.  It's a rule about the admissibility of possibly flawed copies of a document.  It doesn't apply here, because Rodriguez is not trying to introduce his 1040s as evidence of the contents of some other document that has been lost.

Rodriguez's 1040s are good evidence of one thing--they may be admissions of his income.  See Lare v. Commissioner, 62 T.C. 739, 750 (1974), affd. without published opinion 521 F.2d 1399

(3d Cir. 1975). But when it comes to deciding whether he's entitled to the deductions that he claims, Rodriguez has to provide substantiating evidence for any deduction that he claimed on his late-filed 1040s. We can't just take them at face value, but must review them item by item.

II. Rodriquez's Deductions

Rodriguez pecks away at the flock of disallowed deductions with ledgers that he created in 2005--he kept no contemporaneous books or other accounting of his business expenses during the years in question. Many of the expenses in these ledgers are not substantiated with other evidence. We treat them then as argument--not evidence--and use them only to guide us to the appropriate canceled check or credit-card statement. We rely on those checks and statements, as well as Rodriguez's testimony to the extent we find it credible, to decide what deductions he has adequately substantiated.

A.   Cost of Goods Sold

Rodriguez claimed costs of goods sold (COGS) of:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $3,728 | $8,756 | $20,383 | $34,823 |

A taxpayer engaged in a manufacturing or merchandising business can subtract the COGS from gross receipts to arrive at gross income. Sec. 1.61-3(a), Income Tax Regs.; see also sec. 1.162-1(a), Income Tax Regs. Though the COGS is technically an

adjustment to gross income and not a deduction, Rodriguez still has to substantiate the amounts he claimed. See Said v. Commissioner, T.C. Memo. 2003-148.

Rodriguez's first problem is that he's not clear about what he's claiming as COGS; his accountant testified that Rodriguez classified the amounts listed above in his ledger only after he had received the notices of deficiency. The only entries that seem to correspond with claimed COGS are entries for "payroll expenses" in 2000 and 2001, and entries for "bonus expenses" in 1999.

For 1998, there are no journal entries matching the amounts claimed as COGS on Rodriguez's 1040. The canceled checks for that year and the testimony offered at trial give us no additional information. We therefore disallow the 1998 COGS.

For 1999, the amounts Rodriguez lists as "bonus expenses" in his ledger matches amounts claimed as COGS on his 1040. These turn out to be sales incentive trips, one to Las Vegas and several others dealing somehow with water sports. They also include a $150 entry for a "Cook Off Team" and "boxing" expenses totaling $620, substantiated by an entry on a credit card statement for the purchase of "sporting good/equip." One journal entry is for $280 from a liquor store. Drinking, sparring, fishing, and gambling are not properly categorized as COGS. Although they may have been business entertainment under section

274(a), Rodriguez has not substantiated a business purpose for any of them as required by section 274(d).[3]  We therefore disallow the 1999 COGS.

For 2000 and 2001, the "payroll expenses" entries for 2000 and 2001 consist largely of checks made out to specific individuals, at least hinting that they may be labor expenses.  Though we can verify some of the other individual expenses that make up his cumulative COGS using their date, amount, or location from canceled checks or credit card statements, there is no evidence to substantiate their business purpose.  Rodriguez credibly testified that he would occasionally have laborers work on his home property--a personal expense, of course--and sometimes they would work on his investment property.  Checks indicate they also sometimes worked on property owned by a partnership he formed.

But even if the amount spent on improving the investment property was adequately substantiated, it would still be a capital expense and not part of COGS.  See sec. 263(a)(1).  Rodriguez has given us no way to estimate the amounts going to home maintenance versus partnership property versus investment property.  We therefore disallow all 2000 and 2001 COGS.

---

[3] And for expenses listed in section 274(d), Congress demands strict substantiation.  Sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985); see Sanford v. Commissioner, 50 T.C. 823, 827-28 (1968), affd. 412 F.2d 201 (2d Cir. 1969).

B. Advertising

When asked at trial about advertising expenses, Rodriguez stated, "There is a huge amount of money spent by the developer. On my personal items, I would advertise, but I didn't, we would run little line ads to our cell phones * * * but the major expense was taken on by the developer." Rodriguez certainly claimed more than personal ads on his Schedule C:

| 1998 | 1999 | 2000 |
|------|------|------|
| $4,465 | $3,173 | $3,473 |

Section 162(a) allows a taxpayer to deduct advertising expenses that are both "ordinary and necessary" in conducting a "trade or business." Section 6001 requires a taxpayer to keep and present the Commissioner with sufficient documentation to substantiate his tax liability.

Below is Rodriguez's list of advertising expenses for 1998 from his ledger:

| Date | Name | Note | Amount | Substantiated |
|------|------|------|--------|---------------|
| 1/27 | Davy Roberts | For pens | $70.00 | Check No. 2436 |
| 5/15 | Fed-Ex | Messenger fee | 41.00 | No |
| 7/09 | George R.B. | Seminar | 40.00 | No |
| 7/12 | George Self | Referral fee | 597.00 | Check No. 2562 |
| 7/21 | Walmart | Prop. owner picnic | 43.21 | No |
| 8/15 | Furrow's | Lumber for signs | 66.89 | No |
| 8/15 | Labor | Built signs | 475.00 | No |
| 8/15 | Labor | Put out signs | 100.00 | No |

| 8/22 | Labor | Put out signs | 100.00 | No |
|---|---|---|---|---|
| 8/29 | Labor | Put out signs | 100.00 | No |
| 9/02 | Sam's | Labor Day picnic | 1,158.91 | Check No. 2600 |
| 9/25 | Louisiana P | Lumber | 42.36 | No |
| 10/06 | Ducks Unlimited | Sponsorship | 250.00 | Check No. 2627 |
| 10/13 | Ducks Unlimited | Ticket-Brandon | 40.00 | Check No. 2630 |
| 10/14 | Ducks Unlimited | Banquet | 300.00 | Check No. 2633 |
| 10/14 | Ducks Unlimited | Banquet | 970.00 | No |
| 10/24 | Walmart | Prop. owner picnic | 57.22 | No |
| 11/07 | Texas Lotto | Lotto | 3.00 | No |
| 12/18 | Amer. Inst. | Donation | 10.00 | No |

For this year, Rodriguez produced canceled checks as evidence for some of his claimed deductions.  However, referral fees, charitable donations, and picnics don't qualify as advertising expenses without evidence to substantiate that they were ordinary and necessary business expenses under section 162.  He provided no such evidence, and so we sustain the disallowance of these deductions.

We find Rodriguez's testimony concerning signs to be credible, however.  We treat his testimony as an invocation of the rule of Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), that we must make "as close an approximation as [we] can, bearing heavily if [we choose] upon the taxpayer whose inexactitude is of his own making."  Even the Cohan rule,

however, requires that we have some basis for estimating--where we don't, we can't just guess. But on this item, we will use the Cohan rule and allow Rodriguez to deduct $500 for the building and placing of signs in 1998.

For 1999, Rodriguez claimed deductions for gifts, donations, and even a $1 losing Texas lottery ticket, among other things, as advertising expenses without providing evidence or testimony of how they were ordinary and necessary business expenses. We sustain the Commissioner's disallowance of all these expenses for 1999.

For 2000, Rodriguez listed as advertising expenses in his ledger:

| Date | Name | Note | Amount | Substantiated |
|-------|--------------|-----------------|-----------|-----------------|
| 3/7 | Sign It | 7.5 AC & 10 AC | $1,585.86 | Check No. 3296 |
| 3/25 | Collin McGee | Signs 10 AC | 73.20 | Check No. 3309 |
| 4/24 | Excel Signs | Sign 19.78 AC | 1,302.00 | Check No. 3318 |
| 5/6 | Collin McGee | - | 126.00 | Check No. 3323 |
| 5/15 | Collin McGee | 10 AC | 21.00 | Check No. 3342 |
| 7/10 | Collin McGee | 10 AC | 106.00 | Check No. 3381 |
| 12/31 | Newspapers | Various ads | 259.00 | Credit cards |

We are satisfied that these expenses were ordinary and necessary. Rodriguez provided copies of canceled checks or credit-card statements for all of them with specific notations as to their advertising purpose. We therefore allow Rodriguez to deduct $3,473 for advertising expenses in 2000.

C.   Interest

Rodriguez claimed home mortgage interest deductions in his Schedule A for 1999 and 2000, and the Commissioner allowed his itemized deductions for those years.  However, Rodriguez also claimed the following interest deductions on his Schedule C:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $3,168 | $6,509 | $4,882 | $31,332 |

Interest is defined as "compensation for the use or forbearance of money."  Deputy v. du Pont, 308 U.S. 488, 498 (1940).  Whether a fee associated with a debt is interest or compensation for bank services (such as compensation for the expenses of collecting past-due amounts, for example) is a question of fact.  See West v. Commissioner, T.C. Memo. 1991-18, affd. without published opinion 967 F.2d 596 (9th Cir. 1992).  Rodriguez offered no evidence as to how his credit-card company and bank apply fees; for at least one account, the bank appeared to charge a flat $5-per-use ATM fee and a flat $20 not-sufficient-fund fee, which seem like compensation for the use of the ATM and compensation for account services.  Rodriguez has the burden of proof here, and his failure to provide any evidence regarding the nature of these bank fees leads us to find that those types of fees are not interest for any year.

For tax year 1998, Rodriguez claims a deduction for interest of $3,168.  Of this amount, he claims $1,500 in the ledger as

interest on car payments and labels $1,357 as finance charges for his position as sales manager; for his position at Waterfowl, he claims $311.  Rodriguez provided no evidence to substantiate what proportion of his car payments represented business interest and what represented payments of principal or other fees.  We have no basis to estimate any amount using the Cohan rule.

The $1,357 that he listed as finance charges from his job as a sales manager were calculated from his credit cards and checking account with the First Bank of Conroe.  The alleged finance charges include maintenance fees, ATM fees, returned check fees, and other charges.  We categorically deny these, which means Rodriguez gets no interest deduction for 1998.

However, for tax years 1999-2001, we are able to determine some valid interest deductions.  For 1999, Rodriguez deducted $6,509 for interest, but accounts for only $4,899 in the ledger.[4] Disregarding the numerous bank fees that are not interest, we find that there are monthly finance charges that are legally deductible interest.  Sifting through the record, we determine that for tax year 1999, Rodriguez incurred $1,515.43 of interest in the form of credit card finance charges.  We can't entirely disentangle the pervasive intermingling of personal and business

---

[4] Rodriguez has another ledger entry for 1999 related to interest claimed as a deduction for a home office on his Form 8829, Expenses for Business Use of Your Home.  We treat this as a home-office expense, which we analyze infra section J, Home Office.

expenses on the cards, and it appears that Rodriguez did not pay some of this interest but let his credit card balances accrue, so we apply Cohan and allow $606.17, which is 40 percent of the $1,515.43.

For 2000, the ledger once again fails to tell us how Rodriguez could have possibly arrived at his claimed deduction of $4,882 (especially since the ledger itself says there is zero interest for the year). Instead, using the same method as used for tax year 1999, we allow Rodriguez a deduction of $438.24, or 40 percent of the $1,095.60 worth of combined finance charges, a number we obtained again by looking through credit-card statements.

For 2001, Rodriguez deducted $31,332, listed as mortgage interest on line 16(a) of his Schedule C. We have verified the amount directly from record evidence, but it is only by inference that we can determine the purpose of the mortgaged property. We agree with the Commissioner that the record clearly identifies other mortgages on Rodriguez's personal real estate and his partnership's property. By process of elimination we find that the interest Rodriguez paid was on the mortgage for property he was holding for resale.

Section 163(d) says in part:

> (1) In general. In the case of a taxpayer other than a corporation, the amount allowed as a deduction under this chapter for investment interest for any taxable

year shall not exceed the net investment income of the taxpayer for the taxable year.

(2) Carry forward of disallowed interest--
The amount not allowed as a deduction for any taxable year by reason of paragraph(1) shall be treated as investment interest paid or accrued by the taxpayer in the succeeding taxable year.

This means that Rodriguez cannot claim a deduction for investment interest for any year that is greater than his investment income that year. There is no evidence that Rodriguez received any income in 2001 from his investment property, so he may not claim the $31,332 deduction for interest in 2001, but may be able to carry it forward as allowed by section 163(d)(2).

D. Legal Expenses

Rodriguez claimed deductions for legal expenses:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $1,777 | $7,902 | $10,830 | $7,509 |

Rodriguez testified that these expenses arose from two controversies. The first, which appears to have been conducted in 1999, was a lawsuit filed after he allegedly bought property from an individual who had already contracted to sell it to a third party. Section 162 generally allows the deduction of legal fees related to the taxpayer's trade or business. This suit was essentially a title dispute, and the regulations do not allow a taxpayer to deduct legal "expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when

recovered, must be included in gross income), or in developing or improving property." Sec. 1.212-1(k), Income Tax Regs. Rodriguez must capitalize these expenses. Therefore, we disallow Rodriguez's legal fee deductions related to the first suit.

The second suit, which he apparently filed in 2000, was to win reimbursement from Bennett Ebner, the general contractor and developer for all of Montgomery Trace, for some expenses that Rodriguez incurred in sprucing up the grounds at the development. According to Rodriguez, Ebner offered to reimburse Rodriguez for his costs in an effort to increase sales. Rodriguez understood that he wouldn't profit directly, but he believed that beautifying Montgomery Trace would increase sales of the parcels that he managed himself. The agreement did not end well when Ebner allegedly failed to pay Rodriguez for his expenses.

The test for deductibility here is whether Rodriguez's legal expenses had a sufficiently close relationship to his trade or business. The controlling criteria are the origin and character of the controversy. See United States v. Gilmore, 372 U.S. 39, 49 (1963). At the time that this controversy began, Rodriguez worked for a marketing company hired to sell the Montgomery Trace lots on behalf of the owner and developer, Ebco. Rodriguez cared about the appearance of Montgomery Trace; he was the sales manager for that property and received a sales commission for each property he sold as well as an "override" on each property

sold by other salespersons. Rodriguez testified that he suggested the landscaping deal to Ebco, stating: "If we want to increase our sales here, we really need to make this place presentable when we have families out on the weekends." Therefore, although Rodriguez had no expectation of profit for Waterfowl, he did the landscaping with the business purpose of increasing his income from his business of selling property at Montgomery Trace. His credible testimony reflects this business motive. We therefore find that Rodriguez's deal with Ebner was business related.

Rodriguez still has to substantiate, or at least give us enough to estimate, the amounts that he paid in legal fees. The substantiating checks and statements often do not indicate which lawsuit they cover. But Rodriguez credibly testified that it was at most his 2000 legal fees that paid for his litigation with Ebco. We therefore find that the Ebco litigation did not commence until 2000.

For 2000, the ledger lists professional fees going to William Fowler, S. Patrick Rhodes, Jeffery Moon & Associates, and J. Patrick Roeder. The record is clear that Rhodes and Roeder are architects, and therefore these fees are not "legal"; who Jeffery Moon is remains unclear. Checks made out to Fowler, however, are frequently made out to the "Law Offices of William T. Fowler" and indicate legal purposes in the memo lines.

Therefore, we look to checks numbered 3265, 3328, and 3429 made out to William Fowler totaling roughly $750.  None of these checks indicate whether they paid for Ebco litigation or title litigation; we find that some of them did go to the former and, applying Cohan, we allow Rodriguez $500 in legal-fee deductions for 2000.

For 2001, the "professional expenses" category includes checks to Fowler, "DCC," and "McCathern Moody."  The memo on the check for DCC bears no indication of legal purpose.  The check for "McCathern Mooty Buffington LLP" indicates that it is for a partnership agreement.  We ignore both of these and consider only the checks made out to Fowler.  These two total $6,977.08 but bear no indication of whether they were for the Ebco litigation. We therefore estimate under Cohan and allow $4,700 in legal-fee deductions for 2001.

E.    Car and Travel

Certain categories of deductions have enhanced substantiation requirements under sections 274 and 280F.  These categories include travel, certain forms of "listed property," and entertainment expenses.  To deduct any of these expenses, a taxpayer must "[substantiate] by adequate records or by sufficient evidence" the amount, time and place, and business purpose of the expenditure.  Sec. 274(d).  The term "listed

property", as incorporated into section 274, includes any passenger automobile.  Sec. 280F(d)(4)(A)(i).

For the years in issue, Rodriguez offered no evidence to substantiate the amount, time and place, or business purpose of his claimed deductions for car and travel.  Rodriguez and his accountant testified that they used estimates of mileage to calculate deductions, but that Rodriguez kept no travel log.  The strict substantiation requirements of section 274(d), however, mean that neither this Court nor Rodriguez can approximate expenses.  We therefore find that he is not allowed any deductions for car and travel expenses for the years in question. See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. 412 F.2d 201 (2d Cir. 1969); see also sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

F.  Supplies

For tax year 1998, there is no substantiating evidence for Rodriguez's claimed deductions for supplies:

| Waterfowl | Sales Manager |
| --- | --- |
| $6,930 | $9,937 |

The credit-card statements and checks do not match entries in the ledger for the most part, and when they do, there is no indication that they are purchases for a business purpose. Rodriguez may not deduct any expenses for supplies for 1998.

For 1999-2001, Rodriguez claimed these amounts as deductions for supplies:

| 1999 | 2000 | 2001 |
| --- | --- | --- |
| $8,237 | $12,856 | $3,906 |

Most of these purchases can be verified in their amount and location by credit-card statements and canceled checks.  However, there is nothing in the record to support a finding that the expenses at Home Depot, Walmart, Best Buy, etc., were business and not personal.  Rodriguez's pervasive intermingling of business and personal expenses means that we can not allow him all of his claimed deductions.  But we can apply the Cohan rule to estimate a reasonable amount.  See Feingold v. Commissioner, T.C. Memo. 1956-214.  We find that Rodriguez is entitled to deduct much, but not most -- we estimate 40 percent -- of his claimed deductions for the tax years in question and allow him:

| 1999 | 2000 | 2001 |
| --- | --- | --- |
| $3,295 | $5,142 | $1,562 |

G.    Meals and Entertainment

The enhanced substantiation requirements of section 274(d) also apply to deductions for meals and entertainment expenses. Rodriguez used canceled checks and credit-card statements to estimate deductions for meals and entertainment.  These exhibits, even when enhanced with his testimony, fail to provide sufficient substantiating evidence that any of the claimed expenses had a

legitimate business--and not just personal--purpose.  This means
that we disallow all Rodriguez's deductions for meals and
entertainment for all the years in question.

    H.    <u>Other Expenses</u>

The next category was a catch-all for "Other Expenses" of:

| 1998 | 1999 | 2000 | 2001 |
|:---:|:---:|:---:|:---:|
| $27,803 | $10,481 | $10,078 | $8,718 |

The bulk of this category consists of three types of expenses:
security, telephone and contract-labor charges.  There were also
tolls, subscriptions, dues, and miscellaneous expenses that were
not substantiated.  The second Schedule C for 1998 showed an
"other" expense of $168 for bank charges, which we disallow;
Rodriguez has not shown whether they are nondeductible finance
charges or unsubstantiated "other" bank charges, but neither
characterization would make them deductible.  The rest of these
"other expenses" we look at one by one.

    1.  <u>Security</u>

The 1998 and 1999 security expenses of:

| 1998 | 1999 |
|:---:|:---:|
| $1,546 | $7,115 |

are, we find, for the grooming and veterinary care of two dogs
that Rodriguez kept on a piece of property where he stored his
equipment and a trailer.  Deductibility of such expenses depends
on a showing that the expenses are "directly connected" with a

trade or business.  Sec. 1.162-1(a), Income Tax Regs.  Rodriguez
did not credibly testify that the dogs were primarily guarding
business property, and we find that these expenses are just for
his family dogs.  They are not deductible.  See Stone v.
Commissioner, T.C. Memo. 1998-437 (disallowing deductions for
dogs kept at taxpayer's residence); see also Jenkins v.
Commissioner, T.C. Memo. 1995-563 (disallowing expenses of family
dog's fences, food, and veterinary bills).

   2.  Telephones

Rodriguez had both a home phone and a cell phone, neither of
which was a dedicated business line.  He did not provide any
breakdown of the personal-versus-business use of either phone.
His claimed deductions:

| 1998 | 2000 | 2001 |
|------|------|------|
| $841 | $4,035 | $6,218 |

Section 262(b) bans deduction of any charge for basic phone
service for the first line to his home.  The cost of a cell phone
and extra charges (e.g., long distance or dial-up connections)
may be deductible, but Rodriguez must first show that he meets
the requirements of section 162(a).  And under that section, the
phone expenses are deductible if they are "ordinary and
necessary" and paid or incurred in carrying on a trade or
business.  Rodriguez, however, failed to show that he would not
have had the phones but for the business use.  See Wedemeyer v.

<u>Commissioner</u>, T.C. Memo. 1990-324, affd. without published opinion 959 F.2d 243 (9th Cir. 1992). He also introduced no records showing that particular long-distance or toll-call charges related to identifiably business activities. This alone is enough to deny a deduction for both phones.

Cell phones are also listed property under section 280F(d)(4)(A)(v) and thus subject to section 274(d). To substantiate expenses for listed property, a taxpayer must establish the amount of business use and the amount of total use for such property. See sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Rodriguez had credit-card summaries showing payments for a cell phone in 1998 and 1999, but he gave us no evidence of the amount of his business use compared to his total use of the phone. No deductions here. See <u>Nitschke v. Commissioner</u>, T.C. Memo. 2000-230 (denying deduction for expenses on cellular phone due to failure to establish the amount of business use despite receipts and checks).

3. <u>Contract Labor</u>

Rodriguez also claimed deductions for labor costs:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $24,697 | $3,269 | $5,875 | $2,350 |

He claimed that these costs were wages which he paid to day laborers to clean up around the investment properties. However,

Rodriguez could not provide any information about these workers--either their names or contact information.  He did not produce Forms 1099 for them.  He did not establish that these costs did not duplicate at least in part the labor costs he claimed as COGS on his Schedule C.  He did testify credibly that laborers sometimes worked at his personal house, and his checks show that they sometimes worked on his partnership's property; but there are no checks made out to laborers working specifically on investment properties.  Even the ledgers are unclear as to which labor expenses were for what properties.  We have no way to estimate these expenses, so we disallow them.

I.  Depreciation

Rodriguez also claimed deductions for depreciation:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $1,626 | $27,074 | $10,256 | $6,936 |

For tax years 1999 and 2000, Rodriguez attempted to elect to expense depreciation under section 179(a).[5]  Taxpayers are allowed to deduct a reasonable amount for the depreciation of property used in trade or business, or property held for the production of income, sec. 167(a), but must prove the deduction with adequate records, sec. 6001.

_____

[5]  "A taxpayer may elect to treat the cost of any section 179 property as an expense which is not chargeable to capital account.  Any cost so treated shall be allowed as a deduction for the taxable year in which the section 179 property is placed in service."  Sec. 179(a).

Rodriguez did not.  His descriptions of the property are wholly insufficient, limited to general terms like "Equipment", "Office Equipment", and "Furniture and Fixtures."  He failed to introduce any records that substantiate individual purchases of depreciable assets or their bases.  He also failed to specify what individual items he chose to expense.  See sec. 1.179-5(a)(2), Income Tax Regs.  Rodriguez has not thus proven that he is entitled to a depreciation deduction for any of the tax years in question, and he has also failed to substantiate his election under section 179.  This dooms whatever recourse he might have to the Cohan rule for this category.

J.   Home Office

Rodriguez claimed home-office expenses of:

| 1998 | 1999 | 2000 | 2001 |
|------|------|------|------|
| $936 | $17,676 | $3,070 | $2,968 |

Section 280A(a) states:  "Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence."  The Code then provides an exception to this general rule to permit a deduction for home-office expenses "allocable to a portion of the dwelling unit which is exclusively used on a regular basis as the principal place of business for any trade or business of the

taxpayer." Sec. 280A(c)(1)(A). A taxpayer may deduct home-office expenses if he shows his home office is:

! used for a trade or business;

! used exclusively for that purpose; and

! his principal place of business.

According to Rodriguez, he set aside two of the five rooms in his house for business. He put a drafting table and filing cabinet in a small bedroom. He also enclosed the center atrium of the home with drywall and created an office with a desk and computer. He claimed that he conducted "all" of his personal business at the house by making keep-in-touch calls and calls involving buying and selling properties, and also kept private investment records there. He made at least ten sales calls per night except on Tuesday and Thursday nights when he was usually at Montgomery Trace. He also stated that he was unable to conduct his personal business at the sales offices at Montgomery Trace because it was against the developers' policy. We do find Rodriguez credible on this point, and so find that he did conduct personal real-estate business in his home office.

We also find him credible in claiming that his home office was the principal place for his personal real-estate business. Rodriguez worked as a sales manager for several real-estate developers in sales offices from which he supervised personnel and conducted sales. At the same time, he also conducted

personal real-estate business at home. Compare <u>Curphey v. Commissioner</u>, 73 T.C. 766 (1980) (dermatologist who also managed rental properties entitled to home office deduction), with <u>Commissioner v. Soliman</u>, 506 U.S. 168 (1993) (anesthesiologist who administered anesthesia in hospitals denied home-office deductions). We won't apply the <u>Soliman</u> two-prong test, invoked when a taxpayer's job spans several locations, because we find that Rodriguez ran his personal real-estate business only out of his home and that it was separate from his sales-manager position.

However, we do not find Rodriguez to be credible in allocating 40 percent of his house to his home office. Revenue Ruling 62-180, 1962-2 C.B. 52, 54, reasonably states that the business percentage of a residential home may be calculated by comparing the square footage of office space to the home's total square footage or comparing the number of rooms used for the home office to the total, or any other reasonable method. The Commissioner later clarified this by announcing that the room comparison method may be used only if the rooms are all about the same size. IRS Pub. 587 Business Use of Your Home (2007). We have found similar methods of allocation to be reasonable in the past. <u>Feldman v. Commissioner</u>, 84 T.C. 1, 8 (1985), affd. 791 F.2d 781 (9th Cir. 1986). However, we have also rejected a room comparison method when a "more precise" method was available.

Id.  Rodriguez claims that his house has five rooms, two of which he used for an office; we must decide if his allocation was reasonable and sufficiently precise.

We are uncertain how he arrived at his calculation of five rooms; during trial, Rodriguez mentioned a master bedroom, a small bedroom in which he initially put his office, and a living room in which he kept his television.  We assume that his house also had a bathroom and a kitchen, which would total five rooms. But Rodriguez also divided an atrium into two rooms so that he could have a larger office.  It is unclear from the record whether the atrium encompasses any of the other rooms already mentioned.  If it does, the division of the atrium would give Rodriguez's house six rooms, bringing his business percentage to 33 percent.  If the atrium doesn't, Rodriguez would have seven rooms in his home, making his business percentage 28.5 percent. The Commissioner does not challenge Rodriguez's allocation, and therefore we presume the rooms are of roughly similar size. Under Cohan, we weigh against a taxpayer who asks us to estimate; therefore, we find that Rodriguez may claim only 28.5 percent business percentage for his home office deduction.

K.    Net Operating Loss

Rodriguez claims net operating loss (NOL) carryforwards:

| 1999 | 2000 | 2001 |
| --- | --- | --- |
| $26,678 | $24,881 | $40,996 |

The IRS disallowed the NOLs because Rodriguez failed to provide sufficient substantiation of the amount of the losses.  Rodriguez also did not file any election to carry the losses forward without carrying them back first.

Under section 172, NOLs are ordinarily carried back to the two taxable years before the loss year and, if losses have not been fully absorbed, forward to the twenty succeeding years.  In general, the taxpayer bears the burden of establishing the actual amount of NOL carrybacks and carryforwards.  Keith v. Commissioner, 115 T.C. 605, 621 (2000).  If a taxpayer carries losses forward without filing an election, and fails to provide us with sufficient information to determine whether prior years would have been able to absorb some of the loss, we deny him the carryforward.  Whyte v. Commissioner, T.C. Memo. 1986-486, affd. 852 F.2d 306 (7th Cir. 1988).

Rodriguez failed to give us any evidence of either the amount of NOLs he was claiming or whether he had income available in years before 1999 to carry his NOLs back.  We are thus unable to find there was any loss available in 1999, 2000, or 2001 and therefore deny his claimed NOLs for each of those years.

L.   Schedule D Gain

In 1998, Rodriguez sold three parcels of land.  The documents refer to the first two parcels, Lots 10 and 11, by the numbers assigned to them in the original development survey for

Montgomery Trace.  The property those documents call "5 Acres" apparently is a plot in Montgomery County.  We'll follow the parties in discussing Lots 10 and 11 together, and 5 Acres separately.  We compute gain or loss on the sale of property by subtracting basis from sale price.  Sec. 1001(a).

We start with Lots 10 and 11.  The parties have not stipulated to the basis, but did stipulate that Rodriguez could include in basis a $34,661.04 first mortgage and a $8,028.96 second mortgage, and both lots secured these mortgages.  So we have a basis of at least $42,690.  The taxpayer bears the burden of substantiating basis, see Doll v. Commissioner, T.C. Memo. 2005-269; Knauss v. Commissioner, T.C. Memo. 2005-6, so Rodriguez's failure to substantiate any basis greater than these two mortgages leaves him with $42,690.  Rodriguez provided credible evidence that he sold Lot 10 for $59,000 and Lot 11 for $53,900, totaling $112,900.  His gain for Lots 10 and 11 is therefore $112,900 less $42,690, or $70,210.

As for 5 Acres, Rodriguez proved that he bought it for $25,000.  We find that he sold it for $25,000.  He therefore had no gain or loss on the sale.

This all means that Rodriguez had basis of $67,690 in the three properties, sold them for $137,900, and had a total gain of $70,210.

M.    Schedules C and E--Rent

For 1999, 2000, and 2001, Rodriguez went several creative, but losing, rounds with the Commissioner regarding rents claimed on Schedules C and E.  For each year, Rodriguez, doing business as Waterfowl, claimed to pay rent to a partnership which owned an office building called 101 West Phillips.  He deducted that rent on his Schedule C.  Rodriguez was also a partner in this partnership.  He then claimed the rents he paid to 101 West Phillips as partnership income on his Schedule E.

Rodriguez loses his Schedule C rent deduction because he failed to provide credible substantiation.  Rodriguez did not provide a lease for the 101 West Phillips building.  He testified that he made out his rent checks to either partner Brandon Creighton or to 101 West Phillips.  A scan of the checks in evidence shows several checks made out to Brandon Creighton, and a few more made out to Brandon Creighton and Matt Rodriguez. (Rodriguez often goes by his middle name.)  Unlike normal rent payments, the "rent" amounts vary and the payments do not occur at regular intervals.  With few exceptions, the memo lines on the checks do not indicate a reason for the payments or indicate unclear reasons (such as "chambers").  Even more damning is the fact that Rodriguez himself appears able to cash some of these checks, implying that he never truly lost control of the money.

Given the possibility of a related-party transaction and the sketchy facts above, we doubt that these payments were actually "rent," but we need not reach this issue. We find that Rodriguez did not credibly substantiate or explain his rent deductions, foreclosing the possibility of a Cohan estimate, and therefore cannot claim them on his Schedule C.

We next turn to whether Rodriguez properly accounted for the partnership "rent" income to 101 West Phillips on his Schedule E. The Commissioner makes several claims about the Schedules E for 1999, 2000, and 2001: (1) Rodriguez misreported the rental income on his Schedule E; (2) Rodriguez could not use Creighton's statement of partnership expenses as substantiation for his own Schedule E items; and (3) Rodriguez is not entitled to the deductions from partnership income reflected on his Schedules E. We address these points in order.

First, we find that Rodriguez did miscalculate his partnership's rental income. He included all of the "rent" he paid to the partnership as income on his Schedule E, which is an admission. However the partnership agreement confirms that Rodriguez is merely a 35-percent partner, though in his interrogatory responses Rodriguez claimed that he is a 45-percent partner. And his accountant asserted that Rodriguez is a 50-percent partner. We'll go with the partnership agreement, and

find that Rodriguez should have included only 35 percent of the rental income on his Schedule E.

Next, we find that the document proffered as Creighton's statement of partnership expenses is insufficient substantiation. It is not even clear that this statement is in fact Brandon Creighton's. It does not appear to be a contemporaneous log of expenses as they were incurred and has no substantiating receipts or cashed checks. On this point it is immaterial whether Rodriguez and Creighton were in fact 50-percent partners; the evidence is just not sufficient to prove the existence or amount of these expenses regardless of Rodriguez's partnership share.

We therefore find that Rodriguez failed to substantiate his partnership expenses, and so he loses the deductions on his Schedule E. The Commissioner should recalculate Rodriguez's partnership income to reflect his partnership percentage, but not reduce this income by any of the claimed partnership expenses.

N.   Self-Employment Tax

Rodriguez did not report owing any self-employment tax from 1998 through 2001. We agree with the IRS that Rodriguez's submission of Schedules C reporting income from a trade or business is an admission. Rodriguez is thus subject to the self-employment tax for each of the years at issue. See secs. 1401-1403.

O.   Additions to Tax

The last contested items are the additions to tax that the Commissioner determined against Rodriguez for failure to timely file his returns and failure to timely pay the tax owed.  On these, the Commissioner has the burden of production.  Sec. 7491 (c).  Once the Commissioner meets that burden, the taxpayer must come forward with evidence sufficient to persuade us that the Commissioner's determination is incorrect.  Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

1.  Section 6651(a)(1)

The first is the section 6651(a)(1) addition to tax for failure to timely file.  The parties stipulated that Rodriguez failed to file timely returns for the tax years in question. Rodriguez explained at trial that his tardiness was due to the death of his tax preparer--a death that also caused the permanent disappearance of many of his tax records.  Rodriguez, however, could not name the tax preparer.  We do not find him credible on this issue, and sustain the addition.

2.   Section 6651(a)(2)

We likewise sustain the Commissioner's assertion of a section 6651(a)(2) addition for failure to timely pay.  The SFRs that the Commissioner prepared meet the requirements of section 6020(b)(2), and so triggered the start of the period under section 6651(a)(2) for additions to tax for failing "to pay the

amount shown as tax on any specified return." Rodriguez did not provide any evidence to show that his failure to file timely tax returns was due to reasonable cause. We therefore sustain the addition to tax under section 6651(a)(2).

3. <u>Section 6654</u>

Section 6654 imposes a penalty when a taxpayer fails to make estimated tax payments during the year. The estimated tax required for a taxpayer who fails to file--and the returns which Rodriguez filed after starting his case don't count for this purpose, see <u>Mendes v. Commissioner</u>, 121 T.C. 308, 324-25 (2003)--is the lesser of 90 percent of the tax due or 100 percent of the tax shown on the previous year's return (if one was filed). Sec. 6654(d)(1)(B). The Commissioner concedes the section 6654 penalty for 1998 because he didn't offer evidence of Rodriguez's tax liability for 1997. See <u>Wheeler v. Commissioner</u>, 127 T.C. 200 (2006), affd. 521 F.3d 1289 (10th Cir. 2008).

The section 6654 penalties for 1999, 2000, and 2001 remain contested, and the Commissioner has the burden of production. He bore it by proving that Rodriguez owes tax, and had paid insufficient estimated tax, for each of those years. That's all the law requires--we sustain the penalties for those years.

<u>Decision will be entered under</u>

<u>Rule 155</u>.